UNITED STATES DISTRICT COURT
FOR THE
EASTERN DISTRICT OF WISCONSIN

SHAWN SCHIERTS,

        Plaintiff,

vs.

Case No.: 10-C-0657

CITY OF BROOKFIELD and
BART ENGELKING, individually,
and in his official capacity as an employee of the
City of Brookfield Police Department,

        Defendants.

## BRIEF IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
## PURSUANT TO RULE 56 F.R.C.P. AND CIVIL L.R. 7.1 AND 56.2

### I.    FACTS

With its motion, Plaintiff has submitted Proposed Findings of Fact and incorporates them herein by reference. The following summarizes the key facts necessary for a complete understanding of the pending motion. References to the material in the Appendix, submitted herewith, are denoted with the abbreviation "App.".

The Plaintiff, Shawn Schierts, is an individual who resides in the State of Arizona (App. 1, Complaint, p. 2).

The Defendant, Bart Engelking (hereinafter "Engelking"), is an individual who resides in the State of Wisconsin and who, at all times pertinent hereto, was employed, as a police officer, by the Defendant, City of Brookfield, (*Id*).

The Defendant, City of Brookfield, is a municipal corporation, duly licensed to perform, among other functions, law enforcement functions, within the State of Wisconsin, (*Id*).

1

The Plaintiff, and Sarah Pretzel (hereinafter "Pretzel"), were never married, and had a child, ▓▓▓▓, born on ▓▓▓▓▓▓▓ (App. 2, Pretzel Dep. I, Ex. 4, p. 366).

The Plaintiff was adjudicated, ▓▓▓▓ father, in a Dodge County paternity judgment, 04PA137, on June 16, 2005, (*Id.*). The Plaintiff, and Pretzel, were award joint legal custody of ▓▓▓▓, (*Id.*). Pretzel was awarded primary physical placement, and the Plaintiff was given periods of alternate placement, (*Id.*).

Prior to August 13, 2009, neither Pretzel, nor the Plaintiff, had ever before met the Defendant, Bart Engelking (App. 4, Engelking Dep. Pps. 21, 24). The Plaintiff met Engelking, on August 13, 2009, at a daycare facility, in Brookfield, Wisconsin, when Plaintiff was attempting to visit with ▓▓▓▓, (App. 4, Engelking Dep. p. 22). Engelking, while on duty as a City of Brookfield police officer, responded to the daycare facility to assist resolve a placement dispute, that was occurring at that time and location, between Plaintiff and Pretzel. Engelking, eventually, handcuffed Plaintiff and placed him into his squad car. No charges were ever filed against Plaintiff.

On August 13, 2009, and at all times material hereto, there was no pending litigation concerning Plaintiff's relationship with Pretzel, (*Id.*). Engelking and Pretzel continued to communicate, concerning Plaintiff, after they met on August 13, 2009, (App. 3, Pretzel Dep. II, Exs. 1-13).

In a September 1, 2009 e-mail, Pretzel inquired of Engelking: "I wonder what his current address is at this time..." (App. 4, Engelking dep., Ex. 5).

A little over one (1) hour later, Engelking responded to Pretzel's inquiry, stating: "I bet if you were nice that I could come up with one of his addresses. Once I get back to work I will work on it." (*Id.*).

When he returned to work on September 2, 2009, Engelking sent an e-mail to Pretzel stating:

2

> "Sarah – So far I have two addresses for Shawn. I checked his driver's license file and it shows he moved out of Stat to Nevada. That license shows expired with as address of: 1721 Queen Victoria St., Apt. 104, Las Vegas, NV 89144-6530. His other license in Arizona shows: 310 S. 4th St., Suite 2205, Phoenix, AZ 85004. That license shows him as valid. You didn't get this info from me. Hope this helps. Officer B. Engelking #1161, 2100 N. Calhoun Rd., Brookfield, WI 53005 262-
> 787-3702". (*Id.*);

Ten (10) minutes later, Pretzel responded:

> "Hi Bart, Thank you for looking into that. I didn't hear that from you....What a loser. Hope today is a good one back for you and you don't have to cuff any more dead beat dads. Sarah".
> (App. 4, Engelking dep., Ex.6).

Pretzel testified, at her deposition, that Engelking provided her with Schierts'

addresses. (App.3, Pretzel dep.II, p. 50).

On November, 2009, Plaintiff served a Notice of Claim on the defendants.

On November 12, 2009, Engelking sent Pretzel an e-mail that said:

> "If you get this before 5P today (11/12/09) please call me, I have some questions for you."

Fifteen (15) minutes later, Pretzel responded:

> "I will be tied until 5. Is everything okay?"

One (1) minute later, Engelking replied:

> "Not really. Was served papers today...I'm being sued by Shawn and I wanted to asked you if you ever told him that you got his home address from me." (App. 3, Pretzel dep.II, Ex. 13, page 2).

On November 16, 2009, Engelking wrote, in an e-mail to Pretzel:

> "I'm glad we're on the same page that I didn't give you Shawn's address and that you got it from Child Service. Our police records show that we don't even have a home address for him outside of Pewaukee...My original contact with you guys was on August 13th and his lawsuit paperwork says that it was on or around September 02nd. Is that about the time he was filing Child Protective Service reports and you were checking on his Child Support issues? If that was the case then he has nothing. It's not against the law for case workers to supply that information. He's a lonely boy who should have more ammo before he starts a fight." (App.3, Pretzel dep.II, Ex. 11).

3

On November 19, 2009, Pretzel responded as follows:

> "I just looked through my files, and Shawn sent me an email on 9/13 providing me his AZ address. He also sent me an email on 8/31 threatening to call Child Protective Services the following Monday on me—that was the Monday the cop came over to make sure Thomas did not have any bruises. The following day, 9/2 I have records describing a phone call he made to me where the call was originally for ▓▓▓▓▓, but then asked him if he could speak to me to give me his address so I could sent the I-Touch to him. That was the same phone conversation where he made reference to you where you were in for something. I hear that his attorney, Tom Hayes, is semi-retired, and is so because he has a horrible reputation. I wouldn't worry about a thing. Unlike 99.99% of productive U.S. citizens, he has an additional 40 hrs a week to waste---which is why we have to deal with his nonsense so frequently. We're definitely on the same page. Let me know if you need anything else. Also, I have forwarded a lot of those emails he sent to me from Aug and Sep, so make sure you look through those too. Hope you're enjoying your time off (aside from this stuff). Sarah".
> (App.3, Pretzel dep. II, Ex. 11).

On November 26, 2009, Engelking gave a statement to Chief Tushaus:

> "At no time did I provide anyone outside of the department with any personal information about Shawn Schierts, nor did I document Shawn Schierts's personal information on any department paperwork."
> (App. 5, Tushaus dep., Ex. 7).

On May 11, 2010, Pretzel gave a signed statement to the defense investigator stating:

> "that at no time during this incident, or at any subsequent time, did the officer, who she later came to know as Officer Engelking, provide her with any personal information of Shawn Schierts." (App. 1, Defendants' Answer and Affirmative Defenses, Ex. B).

On October 18, 2010, in the midst of an internal investigation into the relationship between Engelking and Pretzel, Engelking was put on administrative leave by the City of Brookfield Police Department. (App. 5, Tushaus dep. Pps. 29, 31).

4

Engelking resigned from the Brookfield Police Department on October 21, 2010 (App.5, Tushaus Dep.p.41, Ex. 6).

Engelking invoked his 5th Amendment right against self incrimination when he was asked in the Plaintiff's 1st Interrogatories, "Have you ever obtained plaintiff's personal information, including, but not limited to, his past, and current, addresses, from the motor vehicle records?" (App. 6, Engelking's Response to Plaintiff's Interrogatory #17).

Engelking invoked his 5th Amendment right against self incrimination when he was asked, in his deposition: "Did there come a point in time when Ms. Pretzel asked you to acquire information from Mr. Schierts' driver's license file?" (App. 4, Engelking dep., 27), and "Did you ever acquire information from Shawn Schierts' driver's license file in Arizona?" (App. 4, Engelking. dep., p. 28).

Engelking invoked his 5th Amendment right against self incrimination when he was asked in the Plaintiff's 1st Interrogatories, "Have you ever published (i.e., given to another person), by any means, plaintiff's personal information, including his past, and current, addresses, from the motor vehicle records?" (App. 6, Engelking's Response to Plaintiff's Interrogatory #18).

The Arizona Department of Transportation (hereinafter "ADOT") driver services unit manager, Cindy Gage, produced ADOT records that identified that there was a National Law Enforcement Telecommunications System (hereinafter "NLETS") request for information from Shawn Schierts' Arizona driver's license file, that originated from law enforcement in Wisconsin, on September 2, 2009. (App. 7, Gage dep., pps. 8,9, 14-18 and Exs. 1 and 5).

## II. LAW

1. **Summary Judgment** - A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The ultimate inquiry is whether a reasonable jury could find for the nonmoving party based on the evidence presented, the legitimate inferences that could be drawn from that evidence in favor of the nonmoving party, and the applicable burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). In determining a motion for summary judgment, all inferences to be drawn from the facts contained in the exhibits and depositions "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962); *Hawkins v. Steingut*, 829 F.2d 317, 319 (2d Cir. 1987). Nevertheless, "the litigant opposing summary judgment 'may not rest upon mere conclusory allegations or denials' as a vehicle for obtaining a trial." *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978).

However, summary judgment is the moment in a lawsuit when a party must show what evidence it has that would convince a trier of fact to accept its version of the events. *Schacht v. Wisconsin Dept. of Corrections*, 175 F.3d 497, 504 (7th Cir.1999). To avoid summary judgment, the non-moving party must "produce more than a scintilla of evidence to support his position." *Pugh v. City of Attica, Indiana*, 259 F.3d 619, 625 (7th Cir.2001).

2. **DPPA - The Driver's Privacy Protection Act of 1994 (hereinafter "DPPA")** -

The DPPA was enacted by Congress in 1994 and is codified at 18 U.S.C. sec. 2721, et. seq.. 18 U.S.C. § 2721(a) states:

(a) In General. - A State department of motor vehicles, and any officer, employee, or

contractor thereof, shall not knowingly disclose or otherwise make available to any person or entity: personal information, as defined in 18 U.S.C. 2725(3), about any individual obtained by the department in connection with a motor vehicle record, except as provided in subsection (b) of this section;...

The DPPA also makes it "unlawful for any person knowingly to obtain or disclose personal information from a motor vehicle record, for any use not permitted "under the law". 18 U.S.C. 2722.

As is set forth above, the DPPA prohibits the release of a motorist's "personal information". "Personal information" is defined as "information that identifies an individual, including an individual's ... name and address" from the Department of Motor Vehicles database, with specific exceptions. 18 U.S.C. § 2725(3).

The DPPA primarily applies to state department of motor vehicles and any officer, employee or contractor thereof. City and village officers do not come squarely within that language, but the DPPA prohibits any person from knowingly obtaining or disclosing personal information from DMV records for purposes not permitted under the DPPA. More importantly, the DPPA prohibits an authorized recipient of personal information (e.g. law enforcement agency engaged in law enforcement functions) from redisclosing the information except for uses permitted under the DPPA 18 U.S.C. 2721(c).

18 U.S.C. 2724(a) of the DPPA provides that:

> A person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual for whom the information pertains, who may bring a civil action in a United States district court.

3. **Vicarious Liability** - Regardless, that the DPPA makes no reference to the issue of vicarious liability, there are numerous situations in which vicarious liability is imposed for violations of federal statutes: not only upon a showing of a "policy or practice of substantial noncompliance."

> "Under general rules of agency law, principals are liable when their agents act with apparent authority and commit torts. The apparent authority theory has long been the settled rule in the federal system…Few doctrines of law are more firmly established or more in harmony with accepted notions of social policy than that of the liability of the principal without fault of his own.'"

7

*Id.* at 568 (*quoting Gleason v. Seaboard Air Line R. Co.*, 278 U.S. 349, 356, 73 L. Ed. 415, 49 S. Ct. 161 (1929)). *Am. Soc. of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 565-68, 72 L. Ed. 2d 330, 102 S. Ct. 1935 (1982).

The Supreme Court, further has noted, in *Hydrolevel*, that:

> In a wide variety of areas, the federal courts, like this Court in *Gleason*, have imposed liability upon principals for the misdeeds of agents acting with apparent authority. *See, e.g., Dark v. United States*, 641 F.2d 805 (9th Cir. 1981) (federal tax liability); *Nat'l Acceptance Co. v. Coal Producers Ass'n*, 604 F.2d 540 (7th Cir. 1979) (common-law tax fraud); *Holloway v. Howerdd*, 536 F.2d 690 (6th Cir. 1976) (federal securities fraud); *United States v. Sanchez*, 521 F.2d 244 (5th Cir. 1975) (bail bond fraud), *cert. denied*, 429 U.S. 817, 50 L. Ed. 2d 77, 97 S. Ct. 59 (1976); *Kerbs v. Fall River Indus. Inc.*,502 F.2d 731 (10th Cir. 1974); *Gilmore v. Constitution Life Ins. Co.*, 502 F.2d 1344 (10th Cir. 1974) (common law fraud). *Hyrdrolevel*, 456 U.S. at 568.

Based on the foregoing principles, in *Hydrolevel,* a case involving the antitrust laws, the Supreme Court stated that:

> 'The purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat' to deter antitrust violations. [*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 139, 20 L. Ed. 2d 982, 88 S. Ct. 1981 (1968).] ... In this case, we can honor the statutory purpose best by interpreting the antitrust private cause of action to be at least as broad as a plaintiff's right to sue for analogous torts, absent indication that the antitrust laws are not intended to reach so far ... A principal purpose of the antitrust private cause of action ... is, of course, to deter anticompetitive practices ... It is true that imposing liability on ... agents themselves will have some deterrent effect, because they will know that if they violate the antitrust laws ... they risk the consequences of personal civil liability. But if, in addition, the principal is civilly liable for the antitrust violations of its agents acting with apparent authority, it is much more likely that similar antitrust violations will not occur in the future. 'Pressure will be brought on the organization to see to it that its agents abide by the law.' *United States v. A&P Trucking Co.*, 358 U.S. 121, 126, 3 L. Ed. 2d 165, 79 S. Ct. 203 (1958). *Hydrolevel*, 456 U.S. at 569-573.

Similarly, in *Farragher v. the City of Boca Raton*, 524 U.S. 775, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998), the Supreme Court held that an employer, as principal, can be held vicariously liable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et. seq., for discrimination caused by the principal's supervisory agents. Significantly, the *Farragher* Court did not carve out any special exception for municipal employers.

In *Meyer v. Holley,* 537 U.S. 280, 154 L. Ed. 2d 753, 123 S. Ct. 824 (2003), the Supreme Court

8

held that the Fair Housing Act, 42 U.S.C. §§ 3604(b), 3605(a), imposed vicarious liability in accordance with traditional agency principles. The Court stated:

> "This Court has noted that an action brought for compensation by a victim of housing discrimination is, in effect, a tort action ... And the Court has assumed that, when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules ... It is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment ... And Congress' silence, while permitting an inference that Congress intended to apply ordinary background tort principles, cannot show that it intended to apply an unusual modification of those rules. Where Congress ... has not expressed a contrary intent, the Court has drawn the inference that it intended ordinary rules to apply." *Meyer*, 123 S. Ct. at 829.

In addition to the above-cited cases, the courts of appeal have imposed vicarious liability for violations of other federal statutes. *See, e.g., Quick v. People's Bank of Cullman County*, 993 F.2d 793 (11th Cir. 1993) (RICO); *United States v. O'Connell*, 890 F.2d 563 (1st Cir. 1989) (False Claims Act). In *Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961, 965 (6th Cir. 1998), the Sixth Circuit held that vicarious liability may be imposed for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1861, et. seq. *Jones* is instructive because much like the DPPA, the FCRA is designed to protect individuals' personal information. *See Jones*, 144 F.3d 961, 965 ("Protecting consumers from the improper use of credit reports is an underlying policy of the FCRA."). In addressing whether the FCRA imposes vicarious liability, the Sixth Circuit stated as follows:

> "In the absence of specific language regarding the imposition of vicarious liability based on apparent authority, we must consider whether an apparent authority theory is consistent with Congress's intent behind the FCRA. Protecting consumers from the improper use of credit reports is an underlying policy of the FCRA. An apparent authority theory is in keeping with the FCRA's underlying deterrent purpose because employers are in a better position to protect consumers by use of internal safeguards. *See Yohay v. City of Alexandria Employees Credit Union, Inc.*, 827 F.2d 967, 972 (4th Cir. 1987) (affirming an employer's liability under the FCRA for employee's wrongful actions where employee-agent acted with apparent authority in improperly obtaining a credit report); *see also Hydrolevel*, 456 U.S. at 572-73 (finding an apparent authority rule consistent with the statutory goal of deterring antitrust violations); *In re Atlantic Fin. Mgmt., Inc.*, 784 F.2d [29,] 32 [(1st Cir. 1996)] (noting in

9

the context of interpreting a securities statute that "imposing apparent authority ... liability will encourage corporate officials to prevent unauthorized (but 'apparently authorized') misrepresentations, thereby helping to achieve an important ... purpose [of the statute]"); *Petro-Tech, Inc. v. Western Co. of No. Am.*, 824 F.2d 1349, 1356 (3d Cir. 1987) (noting applicability of common law doctrines in application of federal statutes when common law principles advance the goals of the particular federal statute). Because application of the apparent authority doctrine advances the FCRA's goals and produces no inconsistencies with other FCRA provisions, we conclude that such a theory of liability is an appropriately operative theory of liability under the statute." *Jones*, 144 F.3d at 965-66.

The same principles apply to the instant situation. The DPPA can be likened to a privacy-based tort action and the FCRA. This is because like privacy-based torts and the FCRA, the DPPA protects the unauthorized use and disclosure of personal information. *See Hydrolevel*, 456 U.S. at 565-66 (likening antitrust violations to torts); *Jones*, 144 F.3d at 965-66. "When Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules." *Meyer,* 123 S. Ct. at 828.

Moreover, like in the case of the antitrust laws, the FCRA, and other similar statutes, imposing vicarious liability upon principals will further the underlying purposes of the DPPA. Imposing individual liability on agents will undoubtedly have some deterrent effect. "But, if in addition, the principal] is civilly liable for the violations of the DPPA by its agents acting with apparent authority, it is much more likely that similar DPPA violations will not occur in the future." *Hydrolevel*, 456 U.S. at 572.

This is particularly so in the present situation where law enforcement personnel are in a unique situation wherein they have relatively easy, free, and unfettered access to motor vehicle records, which access can lead to unchecked abuse. By imposing vicarious liability upon employers, they will have incentive to adopt appropriate policies and procedures to prevent the misuse of motor vehicle records, thereby furthering the DPPA's goals of protecting individuals' personal information found in motor vehicle records. *See Jones,* 144 F.3d 961.

Because there is nothing in the DPPA suggesting that it was not intended to impose vicarious

10

Case 2:10-cv-00657-LA   Filed 12/11/11   Page 10 of 11   Document 36

liability and "application of the apparent authority doctrine advances the [DPPA's] goals and produces no inconsistencies with other DPPA provisions, ... a theory of vicarious liability is an appropriately operative theory of liability under the statute." *Jones*, 144 F.3d at 966; *Hydrolevel*, 456 U.S. at 569. n13.

### III. CONCLUSION

Based on the foregoing, Plaintiff contends that the court should find, as a matter of law, that the defendant, Bart Engelking, in his job as a police officer for the City of Brookfield, did violate he Driver's Privacy Protection Act of 1994 when he acquired the Plaintiff's personal information, from Plaintiff's Arizona, and Nevada, driver's license file. Additionally, Plaintiff contends that the court should find that the defendant, Bart Engelking, did, further, violate the he Driver's Privacy Protection Act of 1994 when he published the Plaintiff's personal information, that Engelking acquired from the Plaintiff's Arizona, and Nevada, driver's license files, to Pretzel, without any law enforcement purpose.

Further, Plaintiff contends that the City of Brookfield is vicariously liable, under the DPPA for Engelking's violation of the DPPA because, at all times pertinent hereto, Engelking was acting in his role as, and with the apparent authority of, a law enforcement officer for the City of Brookfield.

Dated at Milwaukee, Wisconsin this the ___10___ day of December, 2011.

LAW OFFICES OF THOMAS E. HAYES

BY: _____
Thomas E. Hayes
State Bar No.: 01015289

**PO. Address:**
161 West Wisconsin Avenue, #3032
Milwaukee, Wisconsin 53203
(414) 271-9844
thosehayes@gmail.com